Filed 9/2/25  Sangervasi v. City of San Jose CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WILLIAM GERARD SANGERVASI, II,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN JOSÉ,<br><br>Defendant and Respondent. | H051833<br>(Santa Clara County<br>Super. Ct. No. 22CV401855) |

For the last two decades, the City of San José (City) has supported the city's LGBTQ community by, among other things, designating June "Pride Month" and raising the Rainbow Pride flag in front of City Hall during that month.  The San José Police Department (Department) has taken part in this effort.  In August 2019, the Department raised a Rainbow Pride flag in front of Department headquarters, and in July 2020 then-Chief of Police Edgardo Garcia authorized police officers to place Rainbow Pride patches on their uniforms.

When these actions were taken, William Gerard Sangervasi, II was a San José police officer.  In November 2020, he sent Chief Garcia a memorandum objecting that the Rainbow Pride patch was a "disgusting desecration and perversion" of the traditional police uniform.  Sangervasi also asserted that the Chief Garcia's approval of the patch demonstrated that the Chief was "unfit for command" and "an enemy" of the United

States, and Sangervasi threatened to make "a permanent example" out of the Chief. Sangervasi demanded that the Department rescind its authorization of the Rainbow pride patch, and proposed, if alternatives were allowed, several patches of his own, including one containing a dual lightning bolt symbol associated with the Nazi Shutzstaffel (SS). Shortly after receiving the memorandum, the Department placed Sangervasi on indefinite administrative leave, and eventually he was terminated for discourteous treatment of the public and other employees, conduct unbecoming an officer, and dishonesty—charges that with one exception the trial court upheld.

Sangervasi appeals, arguing, among other things, that his memorandum was protected by both the First Amendment and the oath that he swore under article VI of the United States Constitution. As explained below, we reject these arguments and Sangervasi's other challenges to the trial court's rulings and his termination. Accordingly, we affirm the judgment.

## I. BACKGROUND

### A. The Department's July 2020 Memoranda

In July 2020, Chief Garcia issued two memoranda. The first memorandum, entitled "SJPD Pride 'Rainbow Patch' Authorized During August," stated that uniformed personnel "may wear a rainbow SJPD patch on their duty uniforms in observance of Silicon Valley Pride Month." The memorandum explained that "[t]he rainbow colors have become widely recognized as a symbol of LGBTQ pride and community support" and that the Department had created a standard Department patch with an embroidered border displaying the colors of the rainbow. This patch, the memorandum continued, was a public awareness campaign "to demonstrate the support and inclusiveness of the SJPD with the LGBTQ community and all LGBTQ police personnel" as well as the Department's "commitment to diversity and inclusion."

The second memorandum, entitled "Permanently Authorized Specialty Patches," stated that the Department previously had authorized uniformed personnel to use

2

specialty patches for limited periods of time, which proved useful in building public awareness of causes, connecting with community members, and allowing Department members to show individual support for issues important to them. The memorandum authorized specialty patches to be permanently worn for three causes: Breast Cancer, Pride, and the Military. The Pride patch is the same patch that was authorized in the Department's first July memorandum.

**B. Sangervasi's November 2020 Memorandum to the Chief of Police**

On November 11, 2020, Sangervasi responded to Chief Garcia's two July 2020 memoranda in an 11-page, single-spaced memorandum with nine pages of attachments. Sangervasi's memorandum was on Department letterhead and signed "Ofc. William Sangervasi #4230," the badge number the Department issued to Sangervasi. The memorandum was submitted, through the chain of command, to Sangervasi's immediate superior, and the stated subject of the memorandum was "Desecration of *The Uniform*" by Chief Garcia's first July 2020 memorandum, though the second July 2020 memorandum was addressed as well.

Sangervasi objected to use of patches to express personal views of, and advocacy by, officers. Police officers, he argued, are required to provide impartial and unbiased justice to all American citizens, and expressions of personal opinions and advocacy undermine their legitimacy in the minds of the public. Sangervasi also asserted that the Rainbow Pride patch was biased and that it would alienate (and "disgust[]") citizens in need of help from officers. Sangervasi objected as well that the Rainbow Pride patches implicitly endorse diversity, which in his view is incompatible with the concept of a uniform because "diversity seeks division rather than unity through uniformity."

Although Sangervasi did not see the cancer or military patches approved by the Department as problematic, he was exercised by the Rainbow Pride patch. According to Sangervasi, the patch is a "disgusting desecration and perversion" of the Department's traditional uniform. Similarly, in Sangervasi's view, the Rainbow Pride flag, which the

3

Department had flown during Pride month, is an "ugly multicolored rag" that, when flown on a government flagpole, desecrated the American flag. These "abominations," Sangervasi continued, are a form of "visual taunting" that forcibly reminds viewers of "unnatural sexual activity and sex acts," which are "incompatible with nature itself." Indeed, in Sangervasi's view, the Rainbow Pride patch and flag are a form of "sexual harassment" that creates a "hostile work environment" as well as "overt advocacy for oppression and discrimination" because they implicitly exclude "the natural 'hetero-sexual.' "

In his memorandum, Sangervasi contended as well that any decision by an officer to wear the Rainbow Pride patch "calls in question the mental and psychological fitness" of that officer because disclosure of an officer's personal opinions concerning sexual activity is "abnormal and disordered." In fact, Sangervasi implicitly questioned whether any officer who displayed the patch was a true member of the police force or even a true American citizen, asserting that the Rainbow Pride flag and patch were a form of discrimination "against *all* officers and employees in the department and against *every* American citizen." (Italics added.) In addition, Sangervasi stated that "[i]t would appear that any SJPD officer who does not want to wear our official SJPD uniform patch anymore also no longer wants to be, or no longer considers themselves to be, part of our SJPD team."

In Sangervasi's opinion, the "depraved governmental public display" in the Rainbow Pride patch and flag warrants the "physical removal of subversive individuals from within the government entity" perverted by the display and that government officials who have sworn an oath to defend the United States are "duty-bound" to support such action. Indeed, Sangervasi asserted that he could not "stand by idly" while "domestic enemies" destroyed American institutions from the inside, and he promised to "now rise to defend America," restore the sanctity of the American flag, and restore the integrity of the American uniform.

Sangervasi also argued that, by permitting flags and patches that support the LGBTQ community, the Department had created "open forums and billboards for free speech," which it was obliged to open up to anyone without any editorial oversight. Accordingly, Sangervasi submitted six flag and nine patch designs that he demanded the Department immediately approve. The first flag was for "Natural Family Pride" and depicted a man and a woman with three children. Other flags stated "Unborn Babies Lives Matter," "White Lives Matter," and "Unity," not diversity. The remaining two flags were the Confederate battle flag and a United States flag with a blue line in place of one of the white stripes.

Much like the first flag design proposed by Sangervasi, the first two patches proposed by Sangervasi contained the slogans "Natural Hetero-Sexual Pride" and "The Natural-Family Pride," and the final patch stated "Hetero-Sexual Pride." Another patch, with two baby feet, said "Pro Life"; two others contained crosses and swords, with one referring to "Saint Michael"; and a patch for the "Southern Division" contained the Confederate battle flag along with the United States flag and two guns. Finally, a patch proposed by Sangervasi contained two sets of lightning bolts, one set facing right and looking like the letters "SS," and the other set facing left.

Sangervasi concluded his memorandum by asserting that Chief Garcia was "a disgrace" to the traditional police uniform, "unfit for command," and "an enemy" of the United States. He also asserted that Chief Garcia had taken "subversive and perverted" actions—and, thus, was the sort of individual that warranted "physical removal." Sangervasi asserted as well that he would "mak[e] a permanent example out" of Chief Garcia and attempt to demonstrate that the Chief was not entitled to any pension. Finally, Sangervasi said that he would "show no mercy" to anyone who continued Chief Garcia's policies, and he demanded that the Department rescind the memorandum approving use of the Rainbow Pride patch and approve his flag and patch designs.

5

## C. The Department's Response

### 1. *The Investigation and Charges*

On November 13, 2020, two days after Sangervasi submitted his memorandum, the Department suspended him. The City Manager's Office of Employee Relations then partnered with the Department's Internal Affairs Unit to conduct an investigation, which was completed the following November. As part of the investigation, Sangervasi was interviewed. During that interview, Sangervasi told the investigator that the flags and the patches he proposed were intended as satire to show what would happen if the flags and patches were treated as a forum for free speech and that he "didn't want to submit anything that the department would approve." Sangervasi also denied to investigators that he knew that the dual lightning bolt symbol on one of the patches he proposed was associated with the Nazi SS. He explained that the lightning bolts were instead intended to represent the jolt of electricity felt when a taser is fired. He also stated that he found the lightning bolt figure used by searching the Internet for electricity symbols.

Investigators did not believe Sangervasi's explanations, and when they tried to recreate his Internet search, they were unable to find a figure similar to the one that Sangervasi used until they added the term "Nazism" to the search. Accordingly, in November 2021, the investigators recommended that Sangervasi be charged with two violations of the City's Code of Ethics for dishonesty. The investigators also recommended that Sangervasi be charged with violating the City's Discrimination and Harassment Policy based upon most of the flag and patch designs Sangervasi proposed, and with discourteous behavior and conduct unbecoming an officer based upon his demand that Chief Garcia implement his flag and patch designs, his assertion that the Chief was unfit for office and an enemy of the United States, and his veiled threats against the Chief.

The deputy chief in charge of field operations approved the recommendations, and Anthony Mata, who by then had become the Chief of Police, concurred and

recommended to the City Manager that Sangervasi be terminated. Accordingly, on November 10, 2021, Sangervasi was served with a Notice of Intended Discipline asserting two charges of dishonesty, 11 charges of violating the City's Discrimination and Harassment Policy, and three charges of discourteous behavior and conduct unbecoming an officer.

### 2. *The Notice of Discipline*

Sangervasi submitted a written response to the City Manager in lieu of a *Skelley* conference. On February 11, 2022, acting on behalf of the City Manager, the City's Director of Human Relations issued a notice of discipline. The Director of Human Relations sustained all 16 charges against Sangervasi and agreed that Sangervasi should be dismissed.

### 3. *The Civil Service Commission Order*

Sangervasi appealed to the Civil Service Commission (Commission). Over the course of two days, the Commission heard testimony from one of the Department's investigators, Chief Mata, and from Sangervasi. In May 2022, the Commission unanimously upheld Sangervasi's dismissal.

The Commission found that Sangervasi was not acting in a joking or satirical manner in making his flag and patch proposals and that he knew from his training that the double lightning bolt symbol on one of his proposed patches was associated with the Nazi party. The Commission also found that Sangervasi deliberately acted in a provocative, offensive, and threatening manner, which he knew was contrary to City and Department policies. Finally, the Commission found that Sangervasi's actions caused Chief Garcia concern about his safety and disruption to the Department.

Based on these findings, the Commission sustained each of the charges against Sangervasi. The Commission also concluded that dismissal was an appropriate discipline for Sangervasi's violations. While acknowledging that free speech is a fundamental right, the Commission noted that the images that Sangervasi proposed were both chosen

7

intentionally and highly offensive.  In addition, the Commission observed that it was particularly persuaded by the veiled threats against Chief Garcia, which would have been unacceptable even if Sangervasi had meant them satirically:  "When there is clear aggression and threats, veiled or otherwise, that goes beyond the pale and are not a joking matter."

### D.  The Mandamus Petition

Sangervasi filed a petition in the Superior Court for a writ of administrative mandamus challenging his dismissal.  He alleged that the Commission's findings were not supported by the record and that his termination violated the First and Fourteenth Amendments of the U.S. Constitution (but not the Article VI Oath Clause).  Sangervasi also asserted retaliation for his "protected characteristics or perceived protected characteristics" and violations of state and federal employment laws.

The trial court denied the petition.  The court began by considering and rejecting Sangervasi's constitutional defense.  It observed that government entities are entitled to engage in speech and espouse opinions, as the Department did in the memoranda concerning the Rainbow Pride patches and raising the Pride flag at Department headquarters, and that Sangervasi lacked any reciprocal right to respond in the fora used (Department flags and patches).  The court also rejected Sangervasi's argument that the First Amendment prohibited the Department from punishing him for the statements and images in his memorandum.  The court reasoned that the statements and images in his memorandum were not protected by the First Amendment because in the memorandum, which was on Department letterhead and directed to Chief Garcia, Sangervasi was speaking as a public employee, not a private citizen.  In addition, the court determined that, even if Sangervasi had been acting as a private citizen, the discipline imposed upon him was justified.

Turning to the individual charges, the trial court reversed the Commission's finding that Sangervasi was dishonest in claiming that the flag and patch designs he

8

proposed were satirical.  The trial court agreed that, in making these proposals, Sangervasi was not joking or kidding.  However, the court found that the proposals could be both serious and satirical at the same time and that therefore the Commission erred in finding that Sangervasi had been dishonest in saying that the proposals were satirical.

The trial court found no error in the Commission's determination that Sangervasi had been dishonest in denying that he knew that the dual lightning bolt symbols on one of his patches was associated with the Nazi party.  The court noted that the Department presented testimony that Sangervasi received gang awareness training at which he was shown the double lightning bolt symbol and that he intended his patches to contain offensive symbols.  The court also noted that the Commission had not found Sangervasi's explanation of how he came to the dual lighting symbol credible and that Sangervasi had failed to show that this finding was contrary to the weight of the evidence.

The trial court sustained the rest of the Commission's findings as well.  It found that the flags and patches proposed by Sangervasi were "divisive, unwelcome, and offensive" and therefore created a hostile work environment.  It also found that Sangervasi's memorandum was "aggressive and threatening"; failed to adhere to the standards of personal integrity, honesty, and conduct expected of police officers; and impaired the effective functioning of the Department.  Accordingly, the court concluded that Sangervasi had engaged in conduct unbecoming of an officer.

Therefore, except with respect to Charge 1, which it dismissed, the trial court upheld all of the Commission's findings and conclusions, and it affirmed Sangervasi's termination.

The trial court entered judgment, and Sangervasi filed a timely notice of appeal.

## II. DISCUSSION

### A. The Dishonesty Charges

Sangervasi challenges the trial court's decision to sustain the second dishonesty charge against him.  He argues that the court lacked substantial evidence that he knew the

9

dual lightning bolt symbol on one of his proposed patches resembled a symbol associated with the Nazi party and white supremacists. He also argues that the trial court's overruling of the first dishonesty charge against him precluded it from sustaining the second dishonesty charge. As explained below, neither argument is persuasive.

### 1. *Standards of Review*

Decisions of administrative agencies may be challenged by petitioning for a writ of administrative mandate. (Code Civ. Proc., § 1094.5, subd. (a).) Where an agency decision affects a fundamental vested right, the trial court exercises "independent judgment," which means that the entire administrative record must be reviewed to determine whether the weight of the evidence supports the agency's findings. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 (*Bixby*).) In conducting such review, a trial court must afford the agency's findings "a strong presumption of correctness," and the party challenging the findings has the burden of persuading the court that the findings are "contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).) Disciplinary actions, especially where a public employee has been terminated, affect the employee's fundamental vested right in employment and are subject to independent judgment review. (*Id*. at pp. 817-822; *Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 314.)

In conducting independent judgment review, appellate courts review whether the trial court's findings are supported by substantial evidence. (*County of Alameda v. Board of Retirement* (1988) 46 Cal.3d 902, 910; *Bixby*, *supra*, 4 Cal.3d at p. 143, fn. 10.) Under the substantial evidence standard, reviewing courts do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) Instead, under the substantial evidence standard, "the appellate court's power begins and ends with a determination whether there is any substantial evidence" (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*))—that is, " ' "evidence that is reasonable, credible, and of solid value." ' "

10

(*People v. Ramirez* (2022) 13 Cal.5th 997, 1118)  In determining whether a finding is supported by substantial evidence, appellate courts "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.  [Citation.]"  (*Schmidt*, at p. 582.)  Consequently, a party arguing that a finding is not supported by substantial evidence faces a " ' "daunting burden." ' "  (*Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 438.)

### 2.  *Analysis*

The administrative record contains ample evidence supporting the trial court's determination that the Commission did not err in finding that Sangervasi lied when he denied knowing that the dual lightning bolt symbol he used was associated with the Nazi party.

The dual lightning bolt symbol on one of the patches proposed by Sangervasi consists of two jagged bolts, each in the form of the capital letter S.  The Department presented evidence that the Nazi Shutzstaffel or SS, which included Gestapo agents as well as guards at concentration and death camps, used such a symbol and that this symbol has been adopted by white supremacist groups as a symbol of white supremacy.  The Department also presented evidence that Sangervasi attended a South Bay Police Academy training at which the gang awareness instructor presented photos of gang-related tattoos—including four photos with double lightning bolt symbols.  One of the patches proposed by Sangervasi contains similar dual lightning bolt symbols.

On appeal, Sangervasi does not dispute that the dual lightning bolt symbol is associated with the Nazi SS and white supremacist groups, that he attended a training at which this symbol was repeatedly shown, or that one of his proposed patches contains symbols similar to the dual lightning bolt symbol.  Nevertheless, when questioned concerning this proposed patch, Sangervasi denied knowing that it resembled a symbol associated with white supremacist groups, and he asserted that he innocently conceived

11

of the double lightning bolt symbol on his proposed patch to represent tasers, which at the time were being challenged as discriminatory.

The Commission had good reason to reject Sangervasi's explanation. First, the link between the dual lightning bolt symbol and tasers is not obvious, and while all but one of the other patches proposed by Sangervasi contained some slogan or wording explaining the meaning of the images on the patches, the patch with the dual lightning bolt symbol contains no explanation of its meaning. Nor has Sangervasi explained why he did not include an explanation on this patch. Second, if the symbol on the patch had represented a taser, it would not have served Sangervasi's stated goal. In his interview, Sangervasi testified that he wanted to force the Department to display its bias by disapproving the flags and patches that he proposed, and therefore he "didn't want to submit anything that the Department would approve and wouldn't get the point across." However, as Department investigators observed, if the lightning bolts were nothing more than electricity bars, "there would be nothing objectively inappropriate in this particular patch that would necessitate the Chief denying its use." Moreover, Sangervasi has not disputed this determination.

In addition, Sangervasi's explanation how he found the symbol that he used fell apart under examination. Sangervasi told investigators that he searched online for an "electricity barb," found one that he liked, and then doubled it to come up with the symbol in question. However, when investigators tried to replicate Sangervasi's search, despite returning hundreds of images, their search did not include any image resembling the one on the patch. By contrast, when the investigators added the term "Nazism" to the search, they immediately found images similar to the one on the proposed patch.

Based on this evidence, the trial court reasonably inferred that Sangervasi had lied about the dual lightning bolt symbol and that the Commission correctly found that he knew exactly what he was doing in proposing a patch with symbols associated with the Nazi party and white supremacists.

12

Sangervasi asserts that the trial court relied upon "unreasonable speculation" in finding that he knew that his dual lightning bolt symbol was associated with the Nazi party. This finding, Sangervasi contends, is based upon a single reason—"schooling" that occurred a decade ago—and that his use of the symbol is "more readily and reasonably attributable to [his] genuine lack of recollection" or "understandable failure to pay attention" during the gang awareness training at the South Bay Police Academy. (Boldface omitted.) In fact, as shown above, the trial court's finding is also attributable to another fact: Sangervasi's failure to provide a plausible explanation how he selected the dual lightning bolt symbol. Moreover, even absent this evidence, it was not unreasonable for the trial court to infer that Sangervasi remembered his training and knew about the association of the symbol he chose. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582 [the substantial evidence standard requires courts to "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference"].) Indeed, in light of the "strong presumption of correctness" enjoyed by the Commission's findings (*Fukuda*, *supra*, 20 Cal.4th at p. 817), and the Commission's opportunity to assess Sangervasi's demeanor when he denied knowing about the symbol's associations, the trial court may have been compelled to uphold the Commission's finding.

### 3. The First Charge

Sangervasi also objects that the trial court's determination that he was dishonest about the dual lightning bolt symbol is inconsistent with its determination that he was not dishonest in asserting that his proposed flags and patches were satirical. In particular, Sangervasi asserts that the two dishonesty charges against him were "codependent," and because he was found to be honest with respect to the satire charge, he must be found to have been honest concerning the dual lightning bolt symbol as well. We disagree. The trial court did not overturn the Commission's finding on the satire charge based on its evaluation of Sangervasi's general honesty and credibility. It simply found that

13

"Petitioner did not lie when he stated the Uniform Memorandum was satire."  Moreover, the trial court reached this conclusion based on what it found to be the Commission's erroneous assumption that satire is exclusively about humor and a determination that Sangervasi could use satire, while being serious, to ridicule the situation that the Department had created.  There is no inconsistency between that finding and the finding that Sangervasi lied concerning the dual lightning bolt symbol.

## B. The First Amendment

In addition to upholding the Commission's findings on the second dishonesty charge, the trial court upheld the Commission's findings that the proposed dual lightning bolt patch and ten other proposed flags and patches were offensive and violated the City's policy against discrimination and harassment.  The trial court also upheld the Commission's findings that Sangervasi's statements insulting and threatening Chief Garcia were discourteous and unbecoming of an officer.

On appeal, Sangervasi does not dispute that the proposed flags and patches in question were offensive or that they violated the City's policy.  Nor does Sangervasi dispute that his memorandum contained statements that were discourteous and unbecoming of an officer.  Instead, Sangervasi contends that his statements and proposals are protected by both the First Amendment and the Oath Clause of the United States Constitution.

We begin with the First Amendment.  As explained below, we conclude that the First Amendment does not protect Sangervasi's memorandum because in it Sangervasi was speaking as a public employee and because, even if he were not, the Department was justified in disciplining Sangervasi for his statements.

### 1. *Relevant Legal Principles*

The United States Supreme Court has long recognized that " 'the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.' " (*Connick v. Myers* (1983) 461 U.S. 138, 151 (*Connick*).)  When

14

government entities act as employers, they "need a significant degree of control over their employees' words and actions" to ensure "the efficient provision of public services." (*Garcetti v. Ceballos* (2006) 547 U.S. 410, 418 (*Garcetti*).)  Accordingly, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," including on his or her right to speak as a public employee. (*Ibid.*)

At the same time, public employees have rights as citizens, and they "do not renounce their citizenship when they accept employment" with the government (*Lane v. Franks* (2014) 573 U.S. 228, 236 (*Lane*)) or " 'shed their constitutional rights to freedom of speech or expression' " (*Kennedy v. Bremerton School Dist.* (2022) 597 U.S. 507, 527 (*Kennedy*)).  In addition, because government employees are often particularly well-informed concerning matters of public concern, the public has a strong interest in receiving their opinions.  (*Lane*, at p. 236; *Pickering v. Board of Education of Township High School Dist. 205* (1968) 391 U.S. 563, 572 (*Pickering*).)  Accordingly, "the First Amendment protects a public employee's right in certain circumstances to speak as a citizen addressing matters of public concern."  (*Garcetti*, *supra*, 547 U.S. at p. 417.)

In striking the balance among these interests, the Supreme Court has adopted a "two-step inquiry."  (*Lane*, *supra*, 573 U.S. at p. 237; see *Garcetti*, *supra*, 547 U.S. at p. 418.)  The first step is a "threshold inquiry into the nature of the speech at issue." (*Kennedy*, *supra*, 597 U.S. at p. 527.)  Courts examine "whether the employee spoke as a citizen"—rather than as a public employee—"on a matter of public concern."  (*Garcetti*, *supra*, 547 U.S. at p. 418.)  If the employee was not speaking as a citizen, or did not speak about a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."  (*Ibid.*)  However, if the employee spoke both as a private citizen and about a matter of public concern, the First Amendment may be violated, and courts proceed to the second step of the inquiry.  (*Ibid.*) In this step, courts engage in a " 'delicate balancing of the competing interests' " and

15

consider " 'whether an employee's speech interests are outweighed by the ' "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." ' " (*Kennedy*, *supra*, 597 U.S. at p.  528.)

### 2.  *Nature of the Speech in Sangervasi Memorandum*

Sangervasi's First Amendment arguments fail at the first step of the public employee speech inquiry because in his memorandum to Chief Garcia Sangervasi spoke as a public employee, not a citizen.

In *Garcetti*, *supra*, 547 U.S. 410, a deputy district attorney wrote two memoranda to his superiors objecting to a search warrant application from a sheriff's deputy.  (*Id*. at p. 414.)  The United States Supreme Court held that in these memoranda the deputy district attorney spoke as a public employee because the memoranda were submitted "pursuant to his duties as a calendar deputy," and therefore the Constitution did not protect him from discipline for the statements in them.  (*Id*. at p. 421.)  However, the Supreme Court admonished, it was not articulating "a comprehensive framework for defining the scope of an employee's duties," and the inquiry into whether an individual spoke as a public employee is "a practical one."  (*Id*. at p. 424.)

Accordingly, decisions following *Garcetti* have held that, to be speaking as a public employee, an employee's statements need not be "expressly required" by the employee's duties; the statements need only be "in furtherance of such duties." (*Weintraub v. Board of Education of City School Dist. of City of New York* (2d Cir. 2010) 593 F.3d 196, 202 (*Weintraub*).)  For example, courts have held that an individual speaks as a public employee in protesting "alleged mismanagement, which interfered with [the employee's] ability to perform" (*Alves v. Board of Regents of University System of Georgia* (11th Cir. 2015) 804 F.3d 1149, 1165), protesting cutbacks to programs involving the employee (*Haynes v. City of Circleville, Ohio* (6th Cir. 2007) 474 F.3d 357, 364 (*Haynes*); *Mills v. City of Evansville, Ind*. (7th Cir. 2006) 452 F.3d 646, 647-648), requesting reorganization of the employee's department (*Ogden v. Atterhold* (7th Cir.

16

2010) 606 F.3d 355, 360), or objecting to proposed policy changes and thereby " 'contributing to the formation and execution of official policy' " (*Swearingen-El v. Cook County Sheriff's Department* (7th Cir. 2010) 602 F.3d 852, 862).

Courts also look at how the employee's statements were made and their intended audience. For example, courts have held that employees spoke as citizens in testifying in court, writing letters to newspapers, and contacting elected officials or independent agencies. (*Lane*, *supra*, 573 U.S. at pp. 238-241 [testimony in court]; *Pickering*, *supra*, 391 U.S. at pp. 564-565 [letter to newspaper]; *Freitag v. Ayers* (9th Cir. 2006) 468 F.3d 528, 535, 545 [letter to public official and contact with inspector general].) Conversely, courts have held that employees spoke as public employees when participating in discussion about an agency's operations or sending a memorandum to their superiors. (See, e.g., *Paske v. Fitzgerald* (5th Cir. 2015) 785 F.3d 977, 984 [internal discussions]; *Haynes*, *supra*, 474 F.3d at pp. 360, 364 [memorandum].) Indeed, generally speaking, " ' "when a public employee raises complaints or concerns up the chain of command at his workplace, that speech is undertaken in the course of performing his job," ' " and the employee is deemed to be speaking as a public employee. (*Hagen v. City of Eugene* (9th Cir. 2013) 736 F.3d 1251, 1258.)

In his memorandum, Sangervasi spoke as a public employee. Sangervasi did not write a letter to a newspaper, testify in court, speak with an elected public official, or do anything else that an ordinary citizen might do. Instead, he did something that only a Department employee could do. He wrote a memorandum on Department letterhead, which he signed in his official capacity as "Ofc. William Sangervasi," listing his badge number three times. The memorandum was addressed to Chief Garcia and sent "up the chain of command" through a sergeant, Sangervasi's immediate superior. In addition, the memorandum sought to contribute to the formation of Department policy by protesting a policy (concerning patches supporting the LGBTQ community) and demanding a change in that policy (rescission of Chief Garcia's 2020 memoranda). Moreover, in making this

17

demand, Sangervasi recognized that his contentions were being "kept private" and "concealed by the integrity of the chain of command." It is therefore clear that in his memorandum Sangervasi was speaking as a public employee.

Indeed, Sangervasi's memorandum is indistinguishable from the memorandum in *Garcetti* that the Supreme Court held contained statements made by a public employee. Much like Sangervasi, the deputy district attorney in *Garcetti* sent memoranda up the chain of command, albeit to his immediate superiors rather than the head of his office. (*Garcetti*, *supra*, 547 U.S. at p. 414.) Like Sangervasi's memorandum, the memoranda in *Garcetti* protested what the attorney believed was improper conduct (misrepresentations in a warrant affidavit) and sought formal government action (dismissal of a case). (*Id*. at pp. 414, 421.) It is true that the attorney in *Garcetti* had a duty to advise his supervisors how to proceed in the case that he discussed. (*Id*. at p. 421.) However, as noted above, courts have not required that speech be expressly required in order to qualify as speech as a public employee. (*Weintraub*, *supra*, 593 F.3d at p. 202.) In any event, as discussed below, Sangervasi claims that he was obligated to object to the LGBTQ policy by his oath of office, an obligation not shared by ordinary citizens. Therefore, just as the deputy district attorney's statements in the memoranda in *Garcetti* were made as a public employee, Sangervasi's statements in his memorandum were made as a public employee.

At oral argument, Sangervasi stressed that, unlike the memoranda in *Garcetti*, his memorandum does not concern an issue that his official job duties required him to address. However, as just noted, it is well-settled that public employee speech is not limited to speech required by an employee's official duties. (*Weintraub*, *supra*, 593 F.3d at p. 202; see also *Ranken v. Gregory* (7th Cir. 2008) 541 F.3d 769, 773-774; *Philips v. City of Dawsonville* (2007) 499 F.3d 1239, 1242; *Williams v. Dallas Independent School Dist.* (5th Cir. 2007) 480 F.3d 689, 694.) Sangervasi also asserted at oral argument that, even if he made the statements in his memorandum as a public employee, the First Amendment protects the statements because they were made as both a public employee

18

and a citizen. However, in determining whether the First Amendment protects speech by public employees from employer discipline, the Supreme Court has examined whether the employee was speaking as a public employee, not whether the employee was speaking as both a public employee and a citizen. (See, e.g., *Kennedy*, *supra*, 597 U.S. at pp. 528-531; *Lane*, *supra*, 573 U.S. at pp. 238-241; *Garcetti*, *supra*, 547 U.S. at pp. 420-425.) Moreover, Sangervasi offers no reasoned argument or authority supporting his assertion that we should examine whether the statements in his memorandum were made in such a dual capacity. We therefore decline to adopt the novel approach suggested by Sangervasi. (*In re Phoenix H.* (2009) 47 Cal.4th 835, 845 (*Phoenix*) [" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned." ' "]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*) ["When a point is asserted without argument or authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' "].) Instead, we conclude that the First Amendment does not protect the statements in Sangervasi's memorandum because he made those statements as a public employee.

This conclusion is supported by the interests balanced in distinguishing speech as a public employee from speech as a citizen. "[G]overnment offices," the United States Supreme Court has recognized, "could not function if every employment decision became a constitutional matter." (*Connick*, *supra*, 461 U.S. at p. 143, fn. omitted.) To function and efficiently provide public services, government employers "need a significant degree of control over their employees' words and actions." (*Garcetti*, *supra*, 547 U.S. at p. 418). Moreover, managerial discretion is especially important when an employee speaks "in his or her professional capacity" because such speech often "demand[s] the attention of [the employee's] supervisors" and creates a danger of internal conflict. (*Id.* at pp. 422-423.) Consequently, where, as here, a public employee sends a memorandum concerning government policy up the chain of command, his or her

19

employer has a strong interest in retaining "the authority to take proper corrective action"—free from judicial intervention and supervision—against "inflammatory or misguided" statements in the memorandum. (*Ibid*.; see also *id*. at p. 422 ["Official communications must have official consequences . . . ."].)

By contrast, where a public employee sends a memorandum concerning department policy up the chain of command, the First Amendment interests of the employee and the public are limited. Although the public has an interest in receiving the views of public employees, that interest is attenuated when employees make purely internal communications that the public will never receive. An employee's free speech interest as a citizen concerning government policy in purely internal communications is attenuated as well because citizens have no First Amendment right to make internal governmental communications. In addition, despite the discipline that he received for his memorandum, Sangervasi was able to exercise his First Amendment rights as a citizen: Indeed, as the City notes in its brief, Sangervasi sued the City and Chief Garcia in federal court, claiming (albeit unsuccessfully) that they violated his First Amendment rights by refusing to approve the flag and patch designs that he proposed. (*Sangervasi II v. City of San José* (N.D. Cal. May 22, 2023) 2023 WL 3604308, at p. *4; see also *Sangervasi II v. City of San José* (9th Cir. Jan. 14, 2025) 2025 WL 88849 [affirming dismissal of Sangervasi's claim.]) (On our own motion, we take judicial notice of the decisions in Sangervasi's federal case. (Evid. Code, § 451, subd. (a).) Thus, there is little public or personal free speech interest in Sangervasi's memorandum to weigh against the Department's strong interest in regulating the statements in that memorandum, and therefore Sangervasi's memorandum should be treated as speech of a public employee, not a citizen.

Because Sangervasi was speaking as a public employee, not a citizen, in his memorandum, "the Constitution does not insulate [his] communications from employer discipline," and he "has no First Amendment claim based on his . . . employer's reaction

20

to the speech." (*Garcetti*, *supra*, 547 U.S. at pp. 418, 421.) For this reason alone, we conclude that Sangervasi's First Amendment challenge to the discipline imposed upon him fails.

### 3. *The Department's Justification*

Even if Sangervasi's statements in his memorandum had been made as a citizen rather than as a public employee, and the Department's response implicated the First Amendment, the discipline imposed by the Department would be constitutional.

When a public employee speaks as a citizen, the government retains an interest in regulating the employee's speech that justifies imposing greater restrictions than could be imposed on speech by ordinary citizens. (*Pickering*, *supra*, 391 U.S. at p. 568; *Garcetti*, *supra*, 547 U.S. at p. 418.) Consequently, as noted above, when a public employee speaks as a citizen, courts must "engage in 'a delicate balancing.' " (*Kennedy*, *supra*, 597 U.S. at p. 528.) Courts must determine "whether an employee's speech interests are outweighed by ' "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." ' " (*Ibid.*)

A number of considerations may justify restrictions on a public employee's speech as a citizen. For example, an employee's statements may "demonstrate[] a character trait that makes [the employee] unfit to perform her work." (*Rankin v. McPherson* (1987) 483 U.S. 378, 389, fn. omitted (*Rankin*).) In addition, offensive or disruptive statements by public employees may impair "harmony among coworkers" (*Pickering*, *supra*, 391 U.S. at p. 570) or have "a detrimental impact on close working relationships for which personal loyalty and confidence are necessary" (*Rankin*, at p. 388)—a concern of particular importance for law enforcement where the safety and, indeed, life of officers may depend on their ability to rely on their colleagues. (*Helget v. City of Hays, Kansas* (10th Cir. 2017) 844 F.3d 1216, 1223 ["loyalty and confidence among employees is especially important in a law enforcement setting"]; see also *Sager v. County of Yuba* (2007) 156 Cal.App.4th 1049, 1060-1061 [Because "officers must rely on each other

21

during life-threatening situations, they must possess personal qualities conducive to building trust and cooperation"].)  Finally, discourteous and insubordinate statements by public employees may "threaten[] the authority of the employer to run the office" (*Connick*, *supra*, 461 U.S. at p. 153) or otherwise "impair[] discipline by superiors" (*Rankin*, at p. 388).  Moreover, courts "have given substantial weight to a government employer's reasonable predictions of disruption" and other such harms.  (*Waters v. Churchill* (1994) 511 U.S. 661, 673 (*Waters*).).

Here, all of these considerations are present.  First, in light of the statements in Sangervasi's memorandum, the Department expressed concern about his ability to interact with members of the LGBTQ community or individuals that he presumed to be part of that community.  In his memorandum, Sangervasi not only proposed flags and patches extolling "natural" family and hetero-sexuality; he also characterized LGBTQ sexual activity as "unnatural," "dysfunctional," and "incompatible with nature itself."  In addition, he described the Pride patch with the rainbow colors on its border that the Department authorized to demonstrate support for the LGBTQ community, as an "abomination[]," a "disgusting desecration and perversion" of the traditional police uniform, and even a form of "visual taunting" that forces observers to think about "unnatural sexual activity and sex acts."  In light of this visceral response to a simple, multi-colored patch because of its association with the LGBTQ community, the Department had good reason to doubt that Sangervasi would be either willing or able to serve members of that community and, thus, to perform his duties.

Second, substantial evidence supports the Commission's finding, which Sangervasi does not dispute, that the flags and patches proposed in his memorandum, were intended to be offensive to members of the police force and other co-workers. Indeed, the proposed flags and patches asserting "Natural Hetero-Sexual Pride" and "The Natural-Family Pride," the dual lightning bolt patch, the Confederate Battle Flag patch, and the flags asserting "White Lives Matter," "Unity" not "Diversity," and "Unborn

22

Babies Lives Matter," appear designed to offend a broad range of people. In addition, Sangervasi asserted that any officers wearing the Rainbow Pride patch on their uniforms are "obviously biased" and displaying "disordered" opinions. He also asserted that "any SJPD officer who does not want to wear our official SJPD uniform patch anymore . . . also no longer wants to be, or no longer considers [himself or herself], to be part of our SJPD team." These statements and proposals are obviously disruptive and threaten harmony in the Department. In addition, Sangervasi's assertion that officers wearing the Rainbow Pride patch do not consider themselves part of the SJPD team casts doubt upon Sangervasi's willingness to work with and support those officers.

Finally, there was substantial evidence that Sangervasi's memorandum threatened the authority of Chief Garcia and the discipline needed for efficient operation of the Department. In his memorandum, Sangervasi did not just object to the chief's decision to authorize officers to wear the Rainbow Pride patch. He asserted that Chief Garcia had engaged in an "unprecedented and . . . evil attack" on the American flag and the traditional police uniform, the chief was "unfit for command," and the chief was "an enemy of the United States." (Italics omitted.) Sangervasi also asserted a natural right to "physically remove subversive individuals from within the government," threatened to begin an "atonement process" for the chief's actions, and asserted that he would make "a permanent example" of the chief. These disrespectful, disparaging, and threatening remarks concerning Chief Garcia alone would justify discipline. (See, e.g., *Kannisto v. City and County of San Francisco* (9th Cir. 1976) 541 F.2d 841, 842 [upholding dismissal of police officer for "disrespectful and disparaging remarks about a superior officer"]; see also *Gihvan v. Western Line Consolidated School Dist.* (1979) 439 U.S. 410, 415, fn. 4 ["When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it

is delivered."].)  Moreover, as the Commission recognized, the veiled threats against the chief personally are "beyond the pale."

We therefore conclude that, even if Sangervasi had made the statements in his memorandum as a private citizen, the Commission had compelling grounds for disciplining him for those statements.

By contrast, Sangervasi's speech interests have minimal support.  Sangervasi's memorandum addressed a matter of public concern: namely, the Department's use of flags and patches to express support for the LGBTQ community.  However, the memorandum was sent up the chain of command to the Chief of Police, and Sangervasi presented no evidence that he attempted to release the memorandum to the public.  Consequently, even if Sangervasi's statements in his memorandum were made as a citizen, the speech interests implicated by the memorandum were not unusually strong and do not outweigh the Department's compelling reasons for disciplining him.

We therefore conclude that, even if Sangervasi was speaking in his memorandum as a private citizen, the First Amendment does not protect him from discipline for the memorandum's offensive, divisive, disruptive, and threatening statements.

### 4.  *Viewpoint Discrimination*

Sangervasi contends that the Department engaged in impermissible censorship— that is, viewpoint discrimination—by finding offensive only some of the flags and patches that he proposed.  In particular, he asserts that his speech criticizing the Department "cannot be broken up into pieces" and that the charges against him "are incomplete without all of [his] flags and patches as equal charges."  However, we see no reason why the First Amendment would bar the Department from finding some of the flags and patches recommended by Sangervasi offensive and the others innocuous, and Sangervasi fails to offer any authority or argument suggesting otherwise.  Accordingly, we deem Sangervasi's viewpoint discrimination argument abandoned.  (*Phoenix, supra,* 47 Cal.4th at p. 845; *S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

24

### C. The Oath Clause

In addition to arguing that the First Amendment protects the statements in his memorandum, Sangervasi argues that those statements were protected—and mandated—by the Oath Clause in article VI of the United States Constitution because that provision imposes a duty to take action to support and defend the Constitution. This argument is hard to reconcile with the language of article VI, which requires only that state executive officers be bound by an oath "to support this Constitution." (U.S. Const., art. VI, cl. 3.) It also appears to conflict with the Supreme Court's decision in *Cole v. Richardson* (1972) 405 U.S. 676, which noted that the purpose of the oaths required by the Constitution was "not to create specific responsibilities" and that "the connotatively active word 'support' has been interpreted to mean simply a commitment to abide by our constitutional system." (*Id*. at p.684.) However, we need not resolve this issue because it has not been properly raised: While Sangervasi repeatedly invokes the Oath Clause, he fails to offer any authority or argument in support of his contention that the Clause mandated and protected his actions. (*Phoenix, supra,* 47 Cal.4th at p. 845; *S.C.*, *supra*, 138 Cal.App.4th at p. 408; see also *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230-231 [" 'A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.' "].) We therefore reject Sangervasi's Oath Clause argument.

Sangervasi also asserts that history, tradition, and precedent supported his criticism of the Department's authorization of the Pride patch and flying of the Pride flag. In so doing, Sangervasi does not cite any evidence or authority concerning the relevant history and tradition, and he fails to address the Department's apparent previous authorization of specialty patches, or the Supreme Court's recognition that municipalities fly flags—including the Pride flag—to convey governmental or community messages. (*Shurtleff v. City of Boston* (2022) 596 U.S. 243, 254-255, 256.) However, we need not

reach Sangervasi's arguments concerning history, tradition, and precedent because they are predicated on his Oath Clause argument, which we have determined was not properly raised.

### D. Employment Discrimination

Finally, Sangervasi asserts that he suffered employment discrimination and retaliation. Invoking both the Fair Employment and Housing Act (FEHA) (Gov. Code, §§ 12900, et seq.) and title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.), he contends that he experienced "workplace discrimination and unequal treatment" because the Department allowed LGBTQ employees to celebrate each other in the workplace, while prohibiting Sangervasi from celebrating " 'Hetero-Sexual Pride.' " As Sangervasi has not asserted that this alleged discrimination affected his pay, prospects for promotion, or any other condition or privilege of employment, it is unclear whether he has asserted a valid claim for employment discrimination under FEHA or title VII. (See 42 U.S.C. § 2000e-2(a)(1) [prohibiting discrimination with respect to "compensation, terms, conditions, or privileges of employment"]; Gov. Code, § 12940, subd. (a) [prohibiting discrimination in hiring, discharge, "compensation or in terms, conditions, or privileges of employment"].)

However, we need not resolve this question because Sangervasi did not—and could not—raise his FEHA and title VII claims in his petition for administrative mandate challenging his termination. Petitions for administrative mandate require "inquiry into the validity of the final administrative decision made by a public entity employer," not claims that accrued after the decision. (*Gales v. Superior Court* (1996) 47 Cal.App.4th 1596, 1603; see also *Dobos v. Voluntary Plan Administrators, Inc*. (2008) 166 Cal.App.4th 678, 688 ["Judicial review in an administrative mandamus action brought pursuant to Code of Civil Procedure section 1094.5 is limited to issues raised in the proceedings before the administrative agency."].) The Commission order challenged by Sangervasi's petition did not consider any employment discrimination claims. Indeed,

26

Sangervasi represents that he did not receive right-to-sue letters for discrimination claims until "*after* the Civil Service Commission hearing on the termination" of his employment. (Italics added.) As a consequence, Sangervasi's employment discrimination claims are not before us.

Sangervasi also claims that he was terminated in retaliation for his " 'hetero-sexual' protected characteristics." Sangervasi bases this contention on the fact that the Department notified him of the charges against him in June 2021, the same month that the Department raised a Rainbow Pride flag at police headquarters. As Sangervasi was placed on administrative leave in November 2020, the inference that Sangervasi draws from the sequence of events is dubious. However, as this issue was not addressed by the Commission, like Sangervasi's employment discrimination claims, it is not properly before us.

Sangervasi objects as well that in the trial court he was constrained by page limits. However, he does not point to any request in the trial court to file an expanded brief, much less offer any authority or argument suggesting that the trial court abused its discretion by failing to grant him additional pages. Accordingly, we deem this objection abandoned. (*Phoenix*, *supra*, 47 Cal.4th at p. 845; *S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

Lastly, Sangervasi objects to the trial court's refusal to consider evidence not included in the administrative record. However, Sangervasi does not identify the evidence that the trial court refused to consider, much less show that it should have been considered. Instead, he complains that he cannot evaluate whether the trial court should have considered the evidence in question unless the trial court identifies it. In fact, as the Supreme Court has admonished, it is the appellant—not the trial court—who " 'has the burden of providing an adequate record,' " and " ' "if the record is inadequate for meaningful review the appellant defaults and the decision of the trial court should be affirmed." ' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

### III. Disposition

The judgment is affirmed.

_____
BROMBERG, J.

WE CONCUR:


_____
DANNER, ACTING P. J.



_____
WILSON, J.




*Sangervasi II v. City of San Jose*
H051833